UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

DEBRA L. ROOF, )
)
Plaintiff, )
vs. ) 1:09-cv-076-LJM-TAB
)
WHITESTONE ACQUISITION CORP., )
)
Defendant. )

**Entry Discussing Motion for Summary Judgment**

Debra Roof ("Roof") brings this employment discrimination claim against her former employer, Whitestone Acquisition Corp. ("Whitestone"). Roof claims that she has disabilities under the Americans with Disabilities Act ("ADA"), that Whitestone discriminated against her in violation of the ADA, retaliated against her for having disabilities and/or having requested an accommodation, and failed to accommodate her disabilities. Roof also alleges that one of her coworkers harassed her. For the reasons explained below, Roof has failed to establish the existence of elements essential to each of her claims, and thus Whitestone's motion for summary judgment must be **granted.**

**I. Summary Judgment Standard**

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If

the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." FED. R. CIV. P. 56(e)(2). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. See *Harney,* 526 F.3d at 1104 (citing cases). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Id.* at 1104 (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

"In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney,* 526 F.3d at 1104 (internal citations omitted). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

Roof filed materials in support of her response to summary judgment. Appendix A, A2, A3 and C of these materials attempt to inject additional facts into the case in the form of unsworn statements and exhibits prepared by Roof (Appendix A, A2, A3, C). The content of these statements is not considered in this summary judgment decision. The reason for this ruling is that Roof's unsworn statements do not satisfy the requirements of Fed. R. Civ. P. 56(e) that summary judgment materials be "'made upon personal knowledge, [and] shall set forth such facts as would be admissible in evidence . . . .'" *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (quoting *Woloszyn v. County of Lawrence*, 396 F.3d 314, 323 (3d Cir. 2005); and citing *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible hearsay cannot be used to overcome a properly supported motion for summary judgment)).

Further, many of Roof's material facts in dispute were not supported by admissible evidence and therefore they will not be considered by this court in ruling on these motions for summary judgment. *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003) ("[A] party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission and deeming the opposing party's proposed findings of fact admitted and then determining whether those facts entitle the moving party to judgment as a matter of law.") (citing cases). Specifically, statements by individuals who lack personal knowledge and documents that lack relevance to the issues before the court were disregarded. *See Hogue v. City of Ft. Wayne*, 599 F. Supp.2d 1009, 1016 (N.D.Ind. 2009) (affiant's speculative statements about defendant's motives

were outside affiant's personal knowledge and were therefore stricken); *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 614-16 (7th Cir. 2002) (affirmed summary judgment for defendant because district court properly struck all plaintiff's evidence based on relevance and other grounds).

## II. Statement of Facts

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Roof as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

***Roof's Employment at Whitestone***

Whitestone operates a facility in Bloomington, Indiana, where it manufactures adult incontinence products and ships them to customers.

On April 9, 2007, Whitestone hired Roof (through a temporary staffing agency) to fill the temporary vacancy of a woman scheduled to take maternity leave. Prior to Roof's employment, she was interviewed by Joyce Wick, Whitestone's Vice President Administration/Human Resources. During the interview, Roof informed Wick of her allergy to adhesive.

Between April and May, 2007, Whitestone assigned Roof to various tasks including learning the accounts payable position, covering the receptionist's desk, assisting with accounts receivables duties, training with customer service, training on shipping, and performing cycle counts. Most of Roof's assignments required her to work in the front office. On a few occasions she worked in the warehouse, after which her allergy symptoms became so bad she was sick for several days.

Whitestone hired Roof as its own employee on June 11, 2007

On July 3, 2007, Whitestone began performing customer service operations related to its acquisition of another company called Humanicare. In addition to performing the accounts payable duties, Roof began performing the billing for the Humanicare accounts.

Whitestone added shipping and transportation duties to Roof's responsibilities in August, 2007. These duties included making delivery appointments, scheduling trucks, and obtaining freight quotes. Roof performed these duties primarily in the front office because that is where she performed her other duties. Training Roof to work in the supply chain fell to one of Roof's coworkers, Debbie Ducker. Ducker did not have time to train Roof when Roof was available for training.

3

In September, 2007, Roof transitioned the accounts payable duties back to the woman returning from maternity leave. A short time later, Whitestone directed Roof to train two other employees, Chuck Scherzinger and Brett Babbs, to perform the shipping duties. Scherzinger and Babbs both performed their duties from the shipping office.

Roof earned an hourly wage until October, 2007, at which time she negotiated salaried position. Roof remained an at-will employee and did not have any particular job title. Upon Roof's acceptance of the salaried position, Wick informed Roof that she would soon begin spending half her day processing pick-tickets and doing billing, and the other half performing supply chain duties.

The pick-ticket process consisted of sending orders for Whitestone products to the appropriate warehouse so that the products could then be shipped to customers. Wick had been handling the pick-ticket process since mid-summer. Eager to turn over the task, Wick commenced training Roof to process the pick-tickets first. On several occasions when Roof was absent from work, Wick stepped in to perform the pick-ticket duties.

Roof requested a few days off work in late February, 2008, because of serious family issues. Wick was going to be out the same days. Because she would not be able to cover for Roof, Wick decided to have the Director of Inside Sales (and former Customer Service Manager), Ken Edmunds, train another employee to perform pick-ticket duties. The employee, Donna Archer, performed the duties both accurately and timely, so they decided to have her continue doing them.

Because Archer was going to be performing the pick-ticket duties, Whitestone's Director of Supply Chain Management, Karl Hershberger, sent Roof an email on February 26, 2008, stating that when she returned to work, she would begin assisting Babbs in scheduling transportation and that she might also be utilized for inventory and cycle-counting.

Roof received Hershberger's email on February 27, 2008, and immediately told Hershberger that she was allergic to adhesives and needed to avoid them. Hershberger told Roof to assist Ducker and Babbs with counting inventory in the warehouse, to avoid the dust and labels and gave her a dust mask. Roof wore the mask and worked in the warehouse counting inventory all day. Though she felt congested, had watery eyes, and had difficulty breathing through the mask while she was in the warehouse, she did not inform anyone that she was having these difficulties. Roof states that her symptoms were visible.

Roof says her normal duties were taken from her on February 27, 2008, and that she went for most of the week with no duties at all - a situation which made Roof feel threatened, stressed and humiliated.

When Hershberger made arrangements for Roof to go back into the warehouse to train with Ducker on cycle-counting the following week, Roof did not complain.

4

Just before Roof and Ducker entered the warehouse on March 5, 2008, Ducker gave Roof a mask and told her that they were going to be counting adhesives and a product called non-woven. Despite the fact that she would not have to handle the items (which were boxed or wrapped in plastic on pallets), Roof told Ducker that she could not count adhesives because of her allergy, and Ducker excused her from cycle-counting. Roof then reached out to others for work.

Whitestone decided, based on the desire Roof expressed to Ducker on March 5 to avoid adhesives in the warehouse, to immediately take her off inventory and cycle-counting and to have her focus on shipping duties. Hershberger sent Roof an email at the end of the day on March 5 stating that beginning March 6, she was assigned to assist Babbs in shipping, scheduling trucks, and securing freight quotes.

On March 6, Roof worked in the shipping office all day as Hershberger had instructed. She was bothered by the computer and phone set-up in the shipping office. She requested and received a new phone cord that day. Babbs assigned her "a couple of things" to do that day, which she did.

During the day on March 6, Roof sent an email to Whitestone's Vice-President of Operations, Steve Gusse. In the email, she stated that the assignment to work in the shipping office made her feel "outcast to the nether regions." She further stated that she was "feeling tossed out to an environment that isn't quite on the same level as what I am used to and it leaves me feeling burdened." She stated as well that "short of laying my hands on adhesives, which I have a serious reaction to, and did fully disclose when I was hired, I have been willing to do pretty much whatever." Roof admits, however, that nothing about her role in the shipping office required her to touch any kind of adhesive.

When Roof's work-day was over, she opened the drawer in the desk where she had placed her purse earlier, in order to take her purse and leave. At that moment, she saw a box of labels as well as some loose sheets of labels. Though she did not come into contact with these labels, she was upset. She did not tell anyone in the shipping office about the labels. She went to Wick's office, but did not talk to her because Wick was on the telephone. Roof left work for the day, but called Wick on her cell phone later that evening. Wick was in a restaurant at the time, though, and could not hear her. Wick asked her to come speak with her at work the next day. Roof did not, however, come into work the next day.

At 4:07 a.m. the morning of Friday, March 7, 2009, Roof sent an email to Wick and Whitestone's President, James Better. In this email, she complained about being assigned inventory duties which she did not believe to be "an efficient use of [her] abilities." She complained at length about the way her coworker, Debbie Ducker, treated her and made changes to processes that impacted her work. She stated that Ducker disregarded suggestions she made, told her "not to think, just do," and seemed scornful of the fact that she was enrolled at the local community college. She further stated that while she had performed the shipping duties previously and had no problem working with Babbs, she felt

the shipping office was not adequately equipped for telephone and computing, and was generally dirty. Finally, she mentioned the shipping labels that she had noticed in the desk drawer. She requested an accommodation in the email, which was to be able to avoid handling or being near mailing labels.

When Roof arrived at work on Monday, March 10, 2008, Wick provided her a written response to her March 7 email. In the response, Wick told Roof "If you have an allergy to adhesives and are concerned about cycle counting tapes or other similar items, we can work around that and you will not be required to count those items." She also told Roof that she may need to provide information from her doctor about her condition so Whitestone could make this accommodation. She further stated that she would arrange for the shipping office to be cleaned and would address her concerns about the phone and computer. Finally, she informed Roof that she had seen to it that all adhesive labels were removed from the shipping office. She stated "I believe we have attempted to work with you and will continue to work with you to address your concerns about exposure to adhesives."

After she read Wick's response, Roof went to Wick's office. Roof recalls telling Wick "that I cannot do this until it's resolved and we can talk" and then she vacated Wick's office. Roof does not recall what Wick said in response, but Wick was still speaking when Roof left. In addition to getting her purse (which she had placed in her desk in her front office cubicle), Roof also took down a personal photograph that had been damaged. Then she walked out of the facility and went home. Roof says she was in fear for her safety.

When Wick learned that Roof had taken her things and abruptly left the facility just a hour or so after she had arrived, Wick determined that Roof's conduct amounted to insubordination, and considered Roof as having voluntarily abandoned her employment. Roof knew that leaving in that manner jeopardized her job; she testified that she telephoned her husband before she walked out "because I really did not want to quit my job. I didn't want to walk away. . . . But at that point, [my husband] just told me to do whatever I had to do to protect myself."

From the time she became a salaried employee at Whitestone until she left, Roof's salary and benefits did not change. Whitestone's expectations with respect to when she arrived at and left work remained the same. She never lost supervisory authority. Throughout her time at Whitestone, her duties and assignments had been changed by management according to its business needs. Moreover, no one was rude to her or uncooperative with her on March 6. Roof testified that Gusse was "very professional" when he discussed the shipping office assignment with her that morning. She also testified that she always got along with Babbs.

Roof did not check in with Babbs about what he had planned for her on March 10. She did not go see for herself whether the labels had been removed from the shipping office. She admits that, in contrast to the shipping office, the front office had not been cleared of all labels.

The front office, where Roof performed her work most of the time at Whitestone, contained "a lot of" adhesive labels in a variety of locations. Roof testified that, like most office buildings in which she had worked, Whitestone's office contained "a variety of adhesive products, like mailing/shipping labels, labels for products, pricing labels, file labels, peel off labels used for other reasons, and packing tape to name a few items." Specifically, Roof knew that Whitestone kept mailing labels and postage meter labels stocked in the supply closet. While Roof says that she took care to avoid these various adhesive items in the front office, she admits that for much of her time at Whitestone, she frequently handled bills of lading, returned-goods sheets, and pick-tickets that had labels adhered to them. She never asked to be relieved of these duties.

She says she was afraid to work in the warehouse because she didn't know the location of adhesives and she did know the location of adhesives in the office.

No one directed Roof to do any counting in the warehouse on March 10. No one told her that she was no longer working at Whitestone because she had a disability. No one told her that she was no longer working at Whitestone because she had allergies.

### *Allergy to Adhesive*

On a few occasions between 1999 and 2003, when applying a number of standard mailing labels, Roof felt her hands and arms burn and tingle. These symptoms resolved in a few hours. Then Roof had a more intense reaction in 2003 when she touched what she described as an "overnight shipping label." At that time, Roof was employed as an assistant in the physical damage and cargo area for an insurance company called Great West Casualty. She picked up a blank overnight shipping label, with the backing still intact. Her hands turned blue, and she felt short of breath, wheezy, lightheaded, nauseated, and panicked. A coworker drove her the emergency room, where she was admitted and treated with Benedryl. The panic, shortness of breath, wheezing, and lightheadedness quickly resolved while she was still at the hospital. The hospital discharged her a few hours later. She did not pass out. She retained normal grip strength. The feeling of nausea resolved by that evening. The blue color of her hands was gone by the next morning.

The emergency room doctor advised Roof to visit an allergist, which she did. The allergist, Dr. McCormick, applied to Roof's skin a tiny piece of the same shipping label that she had picked up at work and left it there for a day or two. Roof felt intense burning and itching in that place, but none of the same symptoms she had felt that day at work. When she returned and the piece of label was removed, they found the skin had blistered. The doctor concluded that she was allergic to adhesive and recommended total avoidance of adhesive labels. Roof did not give a copy of Dr. McCormick's report to anyone at Whitestone.

Roof's allergy to adhesives limits her because she must avoid going to areas of stores which have concentrations of adhesive (automotive, toy, hardware). She copes with this limitation by asking her husband to shop for her. When her husband or another family

member is not available, Roof does still enter stores to select and purchase the items she needs. Roof says she is unable to obtain items from a store or an area where she has had a reaction unless someone else gets it for her. Roof further testified that her allergy to adhesive limits her in that she must take care to assess what she puts in her hands.

Roof has never again had a reaction like the one she had in 2003, even though there have been times when she has had labels in her hands. She has not used mailing labels or file folder labels since 2003. She continues to use the following commonly-used adhesive items yet has never experienced an allergic reaction to them: post-it notes, scotch tape, glue sticks, product packaging labels, and medical tape. She has never had a reaction to, but nevertheless avoids touching, the following items: postage stamps, masking tape, duct tape, packing tape, envelopes, children's stickers, and bumper stickers.

Roof carries an Epi-pen in case of allergic reaction to adhesives, but she has never had to use it. Roof admits that symptoms from a reaction to labels resolve within three to four hours without medication, and resolve even faster upon administration of medicine. While she wonders whether nasal symptoms and wheezing she experienced from time to time at Whitestone were related to exposure to adhesive, she admits that she never had a serious reaction to adhesives while she worked there. Roof has never had an allergic reaction just from being near a label. As Roof testified: "I can have [adhesive labels] in the room." Roof admits that she will not have an allergic reaction to labels in the absence of such labels.

Following Roof's trip to the hospital in 2003, management at Great West took it upon themselves to "ban" her from the mailroom and to screen her mail for any adhesive labels. She did not, however, tell anyone at Whitestone that these actions had been taken by her former employer. Nevertheless, whenever labels needed to be applied at Whitestone, other employees were happy to comply when Roof asked that they apply the labels for her.

*Allergic Rhinitis*

Roof suffers from symptoms of "lifelong" allergic rhinitis. Roof identified the following symptoms of allergic rhinitis: watery eyes, eye irritation, sinus drainage, nasal congestion, and headaches. She believes that her allergic rhinitis may sometimes trigger wheezing and may also be connected to her migraine headaches. A previous employer purchased an air purifier to help Roof cope with the symptoms of allergic rhinitis. Roof did not, however, request that Whitestone provide her with an air purifier because "it did not occur to" her. She was "able to get by day to day at Whitestone without the help of an air purifier."

There is nothing Roof is unable to do because of allergic rhinitis. Roof admits that "Allergies and sinus problems … are something I've learned to live with." She has learned to treat herself when she suffers from symptoms of allergic rhinitis. Medications she took while she was at Whitestone for her symptoms of allergic rhinitis include Benedryl for watery eyes and nasal congestion, Claritin, Zyrtec, and Singulair (and/or generic versions of these medications) for watery eyes and sinus drainage, as well as itching and hives. These medications were effective at eliminating or reducing her symptoms.

On some days, Roof did not feel able to come to work due to her migraine headaches. She estimated this happened between one and four times per month. On these days, she would stay home part of the day until she was feeling better. Roof testified that Whitestone's management was "good about allowing me to do that." There were also days when Roof came to work despite having a migraine headache; on those days she treated herself with Advil or Tylenol. Roof also testified that she had what she described as "minor headaches" throughout her time at Whitestone, but she "learned to deal with" them; they did not impair her ability to function.

Roof had difficulty talking, interacting with others, and sleeping because of her allergic rhinitis. Roof admits, however, that she was never unable to express herself verbally throughout the course of her work day. She also admits that she got along well with her coworkers and visited with her coworkers during her daily smoke breaks. As for sleeping, Roof testified that her allergic rhinitis caused her to have two to four sleepless nights per month.

**Debbie Ducker**

Roof testified that when she informed Ducker that she "could not work with adhesives, and I would not, then she just – I think she had no use for me." Ducker did not supervise Roof. Roof admits that she and Ducker at all times acted professionally towards each other. Indeed, she admits that on at least two occasions Ducker inquired about her well-being and safety. Regardless, each time that Roof discussed with Wick the problems she felt she was having with Ducker, Wick would talk to Ducker and Ducker's behavior would improve.

**EEO Form**

When Whitestone hired Roof as an employee in June, 2007, it asked her to complete an "EEO Information Form." The form inquired whether she had "a physical or mental impairment that substantially limits one or more major life activities." Roof checked "No." The form also asked her to identify any job accommodations she needed in order to perform her job, and she responded "n/a."

### III. Discussion

Roof claims that she has disabilities under the Americans with Disabilities Act ("ADA"), that Whitestone discriminated against her in violation of the ADA, retaliated against her for having disabilities and/or having requested an accommodation, and failed to accommodate her disabilities. Roof also alleges that one of her coworkers harassed her.

#### A. Qualified Individual with a Disability under the ADA

The ADA prohibits employers from discriminating against an employee on the basis of a disability. 42 U.S.C. § 12112(a). In order to make out a *prima facie* case for ADA

discrimination, the employee must first show that she has a disability within the meaning of the ADA. *Sinkler v. Midwest Prop. Mgmt. Ltd.*, 209 F.3d 678, 683 (7th Cir. 2000). An individual can prove that she is disabled under the ADA by establishing that: 1) she has a physical or mental impairment that substantially limits one or more major life activities, 2) she has a record of such an impairment, or 3) she is regarded as having such an impairment by her employer. *Id.* citing 42 U.S.C. § 12102(2)(A).

Roof's disabilities relevant to this inquiry are allergic rhinitis and allergy to adhesives. Roof's claims of anxiety and near blindness in her right eye shall not be further considered because such claims were raised for the first time in her response to the defendant's motion for summary judgment. See *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) ("The district court is not required . . . to speculate over the nature of the plaintiffs' claim or to refuse to enter summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint."). In addition, there is no evidence that Whitestone regarded Roof as having an impairment based on her anxiety or vision or that these impairments limited Roof in one or more major life activities. Thus, even if Roof's claims of anxiety and poor vision were considered, they would not be meritorious because there is no evidence that Roof's visual impairments or anxiety amount to a disability under the ADA.[1]

For Roof's allergic rhinitis and allergy to adhesives to meet the statutory definition of a qualifying disability, the condition must substantially limit at least one major life activity, or at least be perceived by the employer as substantially limiting a major life activity. *Porch v. Potter,* 367 Fed. Appx. 669 (7th Cir. 2010). Roof has never contended that Whitestone perceived her as being disabled. Thus the relevant inquiry is whether a jury reasonably could conclude from this record that Roof's allergic rhinitis and allergy to adhesives limits a major life activity. This is where Roof's claim ends. She cannot establish that she has a disability because she has not put forward any evidence that she was substantially limited in a major life activity. Aside from stating in her response brief that she is substantially limited in her ability to sleep, breathe, think, talk, concentrate, and access some goods and services, (Roof Brief, p. 22), and that her "allergic symptoms became so bad [she] was sick for several days," (Roof Brief, p. 4), Roof does not submit any evidence regarding the specific limitations of her conditions that prevented or severely restricted her ability to sleep, breathe, think, talk, concentrate, or access certain goods or services. *See, e.g., McCoy v. City of Chicago*, No. 02 C 4973, 2004 WL 1699049 (N.D.Ill. July 28, 2004) (no substantial limitation when plaintiff suffered from chronic sinusitis and allergic rhinitis, but plaintiff

---

[1] Roof never informed Whitestone that she had poor vision or needed any type of accommodation related to her vision. Similarly Roof testified at her deposition that she and Wick discussed that they both suffered from anxiety, but there is no evidence that Roof informed Whitestone that her alleged anxiety affected her ability to perform her job or that she requested an accommodation to assist her in performing her duties. "Indeed, the language of the ADA demonstrates that a reasonable accommodation is connected to what the employer knows about the employee's precise limitations. See 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" (emphasis added))." *Ekstrand v. School Dist. of Somerset,* 583 F.3d 972, 976 (7th Cir. 2009).

10

controlled the condition and failed to present evidence illustrating that it substantially limited a major life activity).

Instead, the record reflects there is nothing Roof is unable to do because of her allergic rhinitis, (Roof Dep., pp. 297-98), that her allergic rhinitis only interfered with her sleep two (2) to four (4) nights a month, (Roof Dep., pp. 276-77, 278), and that she has learned to deal with her symptoms though mitigating measures such as over-the-counter medications. *Storey v. City of Chicago*, 263 Fed. Appx. 511, 514, 2008 WL 382650, 3 (7th Cir. 2008) ("to demonstrate a substantial limitation in sleeping, a plaintiff must either put forth evidence that her purported disability restricts her waking functions, or she must otherwise support her contentions with more evidence than personal assertions.") Roof was never unable to express herself verbally during the course of her work day and she admits that she got along well with her coworkers and visited with her coworkers during her daily smoke breaks. (Roof Dep., pp. 285-86). She further admits that her sinus pressure from allergic rhinitis causes varying degrees of headaches, yet she admits that her "nearly constant 'minor' headaches do not affect her ability to function." (Roof Dep., pp. 292-93; 289-90). There were days when Roof came to work despite having a headache; on those days she treated herself with over-the-counter medications. (Roof Dep., pp. 289-90, 292-93).

Given Roof's failure to submit evidence establishing that her impairment prevented or severely restricted a substantially limiting major life activity the Court finds that no reasonable trier of fact could conclude that Roof's allergic rhinitis or allergy to adhesives constituted a disability within the meaning of the ADA.

### B. Disability Discrimination

Even if Roof could show that she was disabled under the ADA she could not establish a *prima facie* case of discrimination. To establish a *prima facie* case of disability discrimination, Roof must present evidence that: (1) she is disabled within the meaning of the ADA; (2) she was meeting Whitestone's legitimate job expectations; (3) she suffered an adverse employment action; and, (4) Whitestone treated similarly situated employees more favorably. *Kampmier v. Emeritus Corp.*, 472 F.3d 930 (7th Cir. 2007).

An adverse employment action must be material-more than an inconvenience-but it may take many forms. "For example, ... a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation all may indicate an adverse employment action." *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006) (internal quotation and citations ommitted).

Roof is unable to establish that she suffered an adverse employment action. Roof argues that "there was a material and adverse change in the terms, conditions, privileges', and potential for future promotions when I was moved from the executive office to the shipping office." (Roof Brief at 29). However, this conclusion is not supported by the record.

First, the fact that Roof was directed to work out of the shipping office when she preferred to work out of the front office does not amount to an adverse employment action. This inconvenience did not change the conditions of her employment. In fact Roof was directed to work in the shipping office after she expressed her desire to avoid cycle-counting adhesives in the warehouse. (Roof Brief, p. 12). Whitestone did not "ignore" Roof's "allergy complaints"; instead, Whitestone promptly removed Roof from the warehouse when she asked to avoid touching adhesives. (Roof Brief, p. 12). Roof's statement that she was "in fear of being accidently exposed to a deadly substance in the shipping office" (Roof Brief, p. 30) is not sufficient to establish an adverse action when the record reflects that all labels were removed from the shipping office and Roof was so informed. In addition, Roof's concerns about the cleanliness were to be remedied by having the office cleaned daily by a cleaning company. Thus, there is no evidence that Roof's reassignment from the front office to the shipping office was a material adverse employment action.

Second, to the extent Roof contends that she was constructively discharged from her employment, this claim is also unsupported by the evidence. A constructive discharge constitutes an adverse employment action. *Chapin v. Fort-Rohr Motors, Inc.*, 2010 WL 3447734, 5 (7th Cir. September 3, 2010) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). "It occurs when the plaintiff shows that he was forced to resign because h[er] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Id.* (citing *Pa. State Police*, 542 U.S. at 147; *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009); and *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)). Roof contends that she was constructively discharged because Whitestone refused to provide her with work in the front office and to have continued working would have "been consent to continued psychological abuse." (Roof Brief at 30). But, for the reasons explained above, Roof has not shown that the conditions of her employment based on her assignment to work out of the shipping office had become unbearable.

### C. Failure to Accommodate

We now turn to Roof's failure to accommodate claim. To establish her failure to accommodate claim under the ADA, Roof must show that: (1) she is a "qualified individual with a disability"; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 678 (7th Cir. 2010); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). The ADA requires an employer to "mak[e] reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual." *Gratzl*, 601 F.3d at 682 (citing 42 U.S.C. § 12112(b)(5)(A)). "'An employer is not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation.'" *Gratzl*, 601 F.3d at 681-82 (quoting *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir.2008)).

In addition to Roof's inability to show that she is a qualified individual with a disability as discussed above, there is no evidence to support the claim that Whitestone failed to reasonably accommodate her disability. There is no evidence that Roof ever requested an accommodation for her allergic rhinitis. Rather, she admits she chose to cope with those symptoms. The only accommodation she sought for her allergy to adhesive was to be able

to avoid exposure to adhesives. To accommodate Roof's allergy to adhesives, no one at Whitestone required her to apply adhesive labels. When she first signaled that she was concerned about exposure to adhesives in the warehouse, Hershberger offered, and she accepted, a mask that she wore throughout the day. When she relayed her concern a second time, she was excused from warehouse duties. When she expressed concern about adhesive labels in the shipping office, Whitestone cleared the room of all labels.

Roof argues that requiring her to work in the shipping office was unreasonable and insists that she should have been permitted to work in the front office. But Roof admits she will not have a reaction to adhesive labels if there are none present and by ensuring that the shipping office was free of adhesive labels, Whitestone met its obligation to provide her with an effective accommodation; it had no obligation to do more. By rejecting Whitestone's proposed accommodations, Roof was responsible for terminating the interactive process and hence not entitled to relief under the ADA. *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir.1996) ("[W]hen an employee requests a transfer as reasonable accommodation and the employer offers alternative reasonable accommodation, which the employee then refuses, the employer cannot be liable for failing to reasonably accommodate the employee by not transferring him to another position.")

### D. Retaliation

Roof can establish a claim of retaliation using either the direct or indirect methods. *See Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). Under the direct method, Roof could present direct or circumstantial evidence showing that Whitestone fired her because she engaged in statutorily protected activity. *See Phelan v. Cook County*, 463 F.3d 773, 787-88 (7th Cir. 2006). Alternatively, the indirect method required Roof to show that she (1) engaged in statutorily protected activity; (2) performed her job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than other similarly situated employees who did not engage in protected activity. *See Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007).

Roof does not make a specific argument under either test, but in any event, her retaliation claim fails under both tests. Under the direct method, Roof has not provided any evidence that she was fired for engaging in a statutorily protected activity. Rather, the evidence reflects that Roof was terminated for abandoning her job. Roof walked out during her conversation with Wick and left the plant without contacting anyone else employed with Whitestone to discuss anything further. (Roof Dep., pp. 541). Roof does not dispute that she grabbed her purse and took down a personal photograph and walked out of the facility and went home. (Roof Dep., pp. 530- 31). Indeed, Roof admitted that she quit. (Roof Dep., pp. 530-31).

Nor can Roof make out a *prima facie* case under the indirect approach. She did not introduce any evidence to show that similarly situated employees who did not engage in protected activity received more favorable treatment from Whitestone. *See Mannie*, 394 F.3d at 984. In any event, Roof cannot show pretext: she did not provide any evidence to rebut Whitestone's position that the company fired her for abandoning her job. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Although Roof maintains that Whitestone terminated her employment (or moved her to the shipping office

13

– which, as discussed above is not an adverse employment action) based on her email to Wick and Better on March 7, 2010, stating that she had allergies. Roof cannot show that Whitestone did not honestly believe its stated justification for discharging her. *See Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006).

### E. Harassment

Roof alleges that her treatment by co-worker Ducker establish a "cognizable claim for harassment." Specifically Roof explains that 1) she reported to Wick that Ducker was interfering with her pick ticket process in ways that would reflect poorly on Roof, 2) she complained about Ducker's treatment and control of her, and 3) on February 27, 2008, Ducker was angry with Roof because her allergy stopped her from working in the warehouse.[2]

Even if the ADA encompasses a cause of action for hostile work environment, *Conley v. Village of Bedford Park*, 215 F.3d 703 (7th Cir. 2000)(finding that the circuit court has assumed the existence of such claims without expressly deciding whether they are proper), the harassment alleged in support of the plaintiff's hostile work environment claim is insufficient. In order for harassment to approach the level of a hostile work environment, it must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Conley*, 215 F.3d at 713 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citations and quotation marks omitted)). In this case all Roof's claims taken together are neither severe nor pervasive and certainly cannot be characterized as "abusive." Whitestone is thus entitled to summary judgment on Roof's claims relating to any alleged harassment.

### IV. Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Roof has not identified a genuine issue of material fact as to her claims in this case, and the defendant is entitled to judgment as a matter of law. The motion for summary judgment is therefore **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:  10/04/2010

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

---

[2] Roof also argues that she was constructively discharged, but that claim was rejected above.